ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Cooper/Ports America, LLC | ) ASBCA No. 61349 |
| | ) |
| Under Contract No. HTC711-15-D-R036 | ) |

APPEARANCES FOR THE APPELLANT:  W. Barron A. Avery, Esq.
Brian V. Johnson, Esq.
 Baker & Hostetler LLP
 Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Jeffrey P. Hildebrant, Esq.
 Deputy Chief Trial Attorney
Caryl A. Potter, Esq.
Lawrence M. Anderson, Esq.
Danielle A. Runyan, Esq.
 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal involves a contract between the government and appellant Cooper/Ports America, LLC (C/PA) to provide stevedoring services. The government originally entered into the contract with Shippers Stevedoring Co. (Shippers). However, C/PA purchased Shippers' interests in the contract, and entered into a novation agreement with the government. C/PA seeks reformation of the contract's prices based upon a purported misrepresentation because the contracting officers (COs) allegedly promised that they would "work with" C/PA on the contract's prices and purportedly misstated the existing fact that they could not revise the prices due to Shippers underbidding the contract. We hold that C/PA has failed to show that it is entitled to reformation based upon a misrepresentation because (1) the COs' statements that they would work with C/PA did not constitute a binding promise, let alone a promise to revise the contracts' prices; (2) the COs did not misstate the existing fact that the government could not revise the prices due to Shippers underbidding the contract; and (3) we cannot reform the contract to make it illegal. Therefore, we deny this appeal.

FINDINGS OF FACT

1. On January 28, 2015, the United States Transportation Command (government) awarded contract HTC711-15-D-R036 (036 Contract) to Shippers to provide stevedoring

and related terminal services at ports in the Southeastern United States (R4, tabs 1, 4). The 036 Contract was a firm-fixed price contract (R4, tab 4 at 4-6).

2. Shippers was losing money on the 036 Contract (tr. 22-23). Therefore, it approached the entity that ultimately became C/PA about an acquisition (tr. 122-23).[1] C/PA was interested in purchasing Shippers' assets, but was hesitant to acquire the 036 Contract because Shippers' prices were too low. Nevertheless, Shippers insisted upon the 036 Contract being included in the transaction. (Tr. 21-24)

3. During a coffee break at a meeting in May 2016, Christopher Smith, who subsequently became a C/PA Board Member (tr. 119-20), discussed C/PA's potential acquisition of the 036 Contract with CO William Fugate (May Conversation) (tr. 108, 123-24). Mr. Smith explained that C/PA could not afford to assume the 036 Contract because Shipper's prices were too low. There is no evidence that Mr. Smith informed CO Fugate that the reason that Shipper's prices were too low was because Shippers underbid the 036 Contract. (Tr. 108, 124)

4. Mr. Smith testified that CO Fugate responded during the May Conversation that "[w]e can't discuss the rates with you here, the process would be first you have to novate over the contract, you file a claim, and then we'd work with you; the government is not in the business of putting other companies out of business" (tr. 124). CO Fugate testified that he did not make the comment that the government is not in the business of putting other companies out of business in the context of the 036 Contract. Rather, CO Fugate testified that he made that comment in response to a more general criticism from Mr. Smith that the government was always trying to make stevedoring contractors lose money. (Tr. 109) CO Fugate also testified that he did not recall using the phrase "work with." However, CO Fugate testified that he told Mr. Smith:

> that we would make no guarantee that those rates would change. So Mr. Smith asked for what they could do. And on a firm-fixed-price contract, I said that they could submit a claim under the disputes clause and we would evaluate the

---

[1] Cooper/T. Smith and Ports America were two stevedoring/terminal-operating companies. Cooper/T. Smith and Ports American owned Integrated Marine Services, LLC (IMS), which purchased the 036 Contract from Shippers. Subsequently, IMS changed its name to Cooper/Ports America LLC. (Tr. 21-23, 45) For ease of reference, we refer to the entity that became Cooper/Ports America as C/PA, regardless of whether it was known as IMS or Cooper/Ports America LLC at the time.

accusation; however, I would make no guarantee that those rates would be changed.

(Tr. 109-10) C/PA has presented no evidence contradicting the evidence that CO Fugate made those comments. Moreover, there is no evidence that CO Fugate stated during the May Conversation that the government could change prices on a fixed-price contract due to underbidding. (Tr. 124) While we find it doubtful that CO Fugate would independently make a virtually identical statement to that C/PA claims a different CO subsequently made during a different conversation (finding 8), we assume without deciding that CO Fugate stated during the May Conversation that the government would work with C/PA on the 036 Contract's prices (Prices). However, because there is no evidence to the contrary, we find that: (1) CO Fugate clarified that any statement that the government would work with C/PA merely meant that the government would evaluate any claim; and (2) CO Fugate told C/PA that he made no guarantee that the government would revise the Prices. (Tr. 109-10, 124)

5. Effective September 30, 2016, C/PA purchased substantially all of Shippers, including Shippers' interests in the 036 Contract (R4, tab 13; app. supp. R4, tab 74 at 4,347). On September 30, 2016, Shippers and C/PA also submitted a request to the government for novation regarding the 036 Contract (R4, tab 22 at 71-73).

6. On October 1, 2016, C/PA began performing the 036 Contract (R4, tab 31).

7. In October 2016, Chris Lewis, C/PA's Vice President (tr. 212-13), contacted William Seamon, who had replaced CO Fugate as CO (tr. 104-05, 170), to discuss the Prices (October Conversation) (tr. 214). Mr. Lewis informed CO Seamon that "the contract rates aren't good," and inquired how C/PA could revise the Prices. There is no evidence that Mr. Lewis informed CO Seamon that the reason the rates were not good— and that C/PA was seeking to revise the Prices—was because Shippers underbid the contract. (Tr. 214-15, 223)

8. According to Mr. Lewis, CO Seamon responded during the October Conversation that:

> [T]hey're not in business to put contractors out of business, and that he could not talk to me the day that I'm talking to him, because we're not actually the contractor of record. So to have further conversations so they could work with us, [the] contract needed to be novated first and, after the contract was novated, we could have discussions about pricing or other terms.

3

(Tr. 216-17) Mr. Lewis specifically recalled CO Seamon saying that "they would work with us on prices" (*id*. at 218). However, CO Seamon testified that he did not use the phrase work with (tr. 162). Instead, CO Seamon testified that he informed Mr. Lewis that he could not discuss the Prices with C/PA because C/PA was not a party to the 036 Contract. CO Seamon further testified that he told Mr. Lewis that price discussions could occur if C/PA became a party to the 036 Contract, and if it provided a written reason for discussing the Prices. (Tr. 160-62) C/PA presented no evidence negating CO Seamon's testimony that he told Mr. Lewis that price discussions could occur if C/PA provided a written reason for discussing the Prices. Moreover, there is no evidence that CO Seamon stated during the October Conversation that the government could revise the prices on a fixed-price contract due to underbidding. (Tr. 216-18) As discussed above, we find it doubtful that CO Seamon and CO Fugate would independently make virtually identical statements during separate conversations (finding 4). Nevertheless, we assume without deciding that CO Seamon stated during the October Conversation that the government would work with C/PA on the Prices (tr. 216-18). However, because there is no evidence to the contrary, we find that CO Seamon clarified that any statement that the government would work with C/PA merely meant that price discussions could occur if C/PA provided a written reason for discussing the Prices (tr. 160-62).

9. According to CO Fugate, CO Seamon, and other government personnel, the government cannot revise rates on a firm-fixed price contract due to underbidding because that would be unfair to competitors (tr. 111, 160-61, 174-75, 177, 179, 195, 197, 202).

10. On November 15, 2016, the government signed a novation agreement, approving the September 30, 2016 sale (R4, tab 10 at 8-9). Effective December 22, 2016, the government issued a modification, which incorporated the novation agreement (*id.* at 1).

11. On January 27, 2017, C/PA requested revision to the Prices (R4, tab 42).

12. On January 31, 2017, the government rejected C/PA's request to revise the Prices. *Id.*

13. On February 27, 2017, the Commander of the 842nd Transportation Battalion (Commander) emailed CO Seamon about C/PA's financial hardships due to the fact that Shippers "drastically underbid their commodity rates to attain selection for the contract." (R4, tab 50 at 3)

4

14. On March 15, 2017, C/PA submitted a notice of intent to file a claim (Notice). The Notice stated that C/PA was entitled to reformation of the 036 Contract due to impracticability and mutual mistake. The Notice also requested a meeting (R4, tab 15 at 1-4).

15. C/PA and the government held a meeting on March 23, 2017 (R4, tab 16). At that meeting, the government refused to discuss the Prices (tr. 36, 175) because it did not believe that the Notice provided a compelling reason to revise the Prices (tr. 177-78). Thus, the government informed C/PA that it could file a "legitimate claim," which would enable the government to speak with C/PA about the Prices (tr. 36, 38).

16. On June 26, 2017, C/PA filed a request for equitable adjustment (REA), asserting that the 036 Contract should be reformed due to a unilateral mistake (R4, tab 67 at 5-6).

17. On August 1, 2017, C/PA filed a certified claim, asserting, *inter alia*, misrepresentation (R4, tab 22 at 1, 7).

18. The CO denied the claim on September 20, 2017 (R4, tab 23).

19. C/PA appealed the denial of the claim, which we docketed as ASBCA No. 61349.

20. The government moved for summary judgment on the misrepresentation claim. We denied that motion. We held that, drawing all reasonable inferences in favor of C/PA, there was a genuine issue of material fact about whether the government made a misrepresentation because "it is reasonable to infer from any statement that the government would work with C/PA that the government would renegotiate the 036 contract's prices . . . ." *Cooper/Ports America, LLC*, ASBCA No. 61349, 19-1 BCA ¶ 37,285 at 181,405 (*C/PA I*). However, we also held that "[w]hether the evidence from Mr. Smith and Mr. Lewis constitutes clear and convincing evidence that the COs stated that the government would work with C/PA—and whether the most reasonable inference from that statement would be that the government would renegotiate the 036 Contract's prices—are issues that we cannot resolve at this stage." *Id.*

21. We held a hearing on May 17, 2021, and this appeal has been fully briefed.

DECISION

C/PA has failed to show that it is entitled to reformation based upon a misrepresentation. We have summarized the doctrine of reformation based upon a misrepresentation as follows:

> Reformation is that remedy in equity by means of which a written instrument is made or so construed as to express or conform to the real intention of the parties when some error or mistake has been committed. Equity has jurisdiction to reform a written instrument where there has been a meeting of the minds and an agreement has actually been entered into, but the written instrument does not express what was actually intended by the parties, due to . . . mistake by one of the parties accompanied by inequitable conduct by the other party, such as for example, misrepresentation. Where, due to misrepresentation of one party and the mistake of the other, a written contract fails to express the agreement which they had manifested an intent that the writing should express, the victim of the misrepresentation can get a decree of reformation of the writing.

*Rainbow Valley Corp*, ASBCA No. 11691, 68-2 BCA ¶ 7,195 at 33,413-14 (citations omitted). A promise accompanied by a misstatement of existing fact may constitute a misrepresentation. *Id.*[2]

---

[2] The parties dispute the proper standard of review (app. br. 36-37; gov't br. 11; app. reply 7-9). It appears that, while a contractor need only prove a misrepresentation by a preponderance of the evidence (*Lebolo-Watts Constructors 01 JF, LLC*, ASBCA No. 59740, 21-1 BCA ¶ 37,789 at 183,426; *King Aerospace, Inc.*, ASBCA No. 57057, 16-1 BCA ¶ 36,451 at 177,651; *Dale Ingram, Inc.*, ASBCA No. 12152, 74-1 BCA ¶ 10,436; *Catalytic Engr. And Mfg. Corp.*, ASBCA No. 15257, 72-1 BCA ¶ 9,342), it must prove entitlement to reformation by clear and convincing evidence. *Timber Investors, Inc. v. United States*, 587 F.2d 472, 475 (Ct. Cl. 1978); *C/PA I*, 19-1 BCA ¶ 37,285 at 181,404-05. In any event, we need not determine which standard of review to apply to which particular elements of C/PA's claim here because, even under the lower preponderance of the evidence standard, we find that C/PA has failed to show that the government made a misrepresentation entitling C/PA to reformation.

Here, C/PA's central argument is that it is entitled to reformation of the Prices because the government made a misrepresentation.[3]  In particular, C/PA argues that the misrepresentation was a promise to work with it on the Prices, when, in fact, the government could not revise prices on a fixed-price contract due to underbidding.  (App. br. 2-3, 35-37, 49-50)  That argument fails for three alternative reasons.

First, the government's statement that it would work with C/PA on the Prices did not constitute a binding promise, let alone a promise to revise the Prices.  Courts have repeatedly recognized that a statement that one party will "work with" another party is too vague, indefinite, uncertain, and lacking clarity as to all essential terms to constitute a binding promise.  *See Melanson v. Navistar, Inc.*, No. 13-CV-2018-D, 2014 WL 4375715 at *6-*7 (N.D. Tex., Sept. 4, 2014) (holding that an employer's oral promise to a foreign employee that it would work with human resources to obtain a permanent residence visa was too vague, indefinite, uncertain, and lacking clarity as to all essential terms to constitute a binding promise to sponsor the employee's permanent residence application); *Battah v. Resmae Mortgage Corp.*, 746 F. Supp. 2d 869, 876 (E.D. Mich. 2010) (holding that a bank's promise to work with a borrower "is too vague to qualify as a specific promise to modify [a] mortgage contract in lieu of foreclosure").  Thus, the government's statements here that it would work with C/PA on the Prices were too vague, indefinite, uncertain, and lacking clarity as to all essential terms to constitute binding promises (findings 4, 8).

For example, the phrase "work with" is vague as to whether it means that the government actually will revise the Prices, or merely discuss revising the Prices.[4]  However, when read in context, it becomes clear that the government did not state that it actually would revise the Prices because CO Fugate expressly stated during the May

---

[3] C/PA does not specify which contract it is seeking to reform.  However, it cannot be seeking to reform the 036 Contract.  Reformation modifies a contract so that it expresses the contracting parties' real intent.  *Rainbow Valley*, 68-2 BCA ¶ 7,195 at 33,413-14.  Shippers and the government could not have intended that the prices in the 0036 Contract be higher based upon a misrepresentation during the October and May Conversations because those conversations occurred after the award of the 0036 Contract (findings 1, 4, 7).  Thus, C/PA must be seeking to reform the novation agreement to change the prices.  However, as discussed above, the parties could not have intended to reform the novation agreement to revise the 036 Contract's prices because the government may not revise a fixed-price contract's prices due to underbidding.

[4] C/PA's definition of the phrase work with as to renegotiate is unhelpful because it just begs the question of whether the word renegotiate means to actually revise the Prices or merely to discuss revising the Prices (app. br. 49-50).

Conversation that he made no guarantee that the government would revise the Prices (finding 4). Rather, CO Fugate and CO Seamon told C/PA that any statement that the government would work with C/PA merely meant that the government would evaluate any claim and discuss the Prices if C/PA provided a written reason for discussing the Prices (findings 4, 8). Those statements were too vague, indefinite, uncertain, and lacking clarity as to all essential terms to constitute a binding promise. *See Melanson*, 2014 WL 4375715 at *6-*7; *Battah*, 746 F. Supp. 2d at 876.

In any event, any promise to merely discuss the Prices would be insufficient to establish C/PA's reformation claim. When we reform a contract, we make it conform to the parties' real intention. *Rainbow Valley*, 68-2 BCA ¶ 7,195 at 33,413-14. Thus, because, C/PA seeks to have us revise the Prices (app. br. 50), it must show that the parties intended to agree to revise the Prices; and not merely to discuss revising the Prices. As discussed above, the parties clearly did not intend to agree to revise the Prices because CO Fugate told C/PA during the May Conversation that he made no guarantee that the government would revise the Prices (finding 4). Therefore, C/PA has failed to show that the government made the specific promise (*i.e.*, to revise the Prices) that would support the reformation it seeks (*i.e.*, to revise the Prices).[5]

Second, there was no misstatement of an existing fact because the government never stated that it could revise prices on a fixed-price contract due to underbidding (findings 4, 8). Indeed, C/PA does not point to any specific government statements indicating that the government could revise prices on a fixed-price contract due to underbidding. Instead, C/PA argues that the government implied that it could revise prices on a fixed-price contact due to underbidding by stating that it would work with C/PA on the Prices in response to the purported disclosures of C/PA and the Commander of the fact that Shipper's underbid the fixed-price 036 Contract. (App. br. 39-42; app. reply 4, 6) As an initial matter, C/PA does not cite any authority for the proposition that it can establish a misstatement of an existing fact based upon an implied misrepresentation (*id.*). Even if it could, C/PA has failed to show that there was an

---

[5] As discussed above, we find it doubtful that both CO Fugate and CO Seamon would independently make virtually identical statements during separate conversations that the government is not in the business of putting contractors out of business (findings 4, 8). In any event, that statement would be even vaguer than the statement that the government would work with C/PA, and thus less of a binding promise, let alone a binding promise to revise the Prices. On the contrary, the evidence shows that—at least CO Fugate—merely was responding to a general criticism that the government was always trying to make stevedoring contractors lose money (finding 4).

implied misrepresentation here.  C/PA has not shown that the government said that it would work with C/PA in response to C/PA's disclosure of the fact that Shippers' underbidding the 036 Contract because C/PA merely disclosed that the Prices were too low; it did not disclose that the reason that the Prices were too low was because Shippers underbid the 036 Contract (findings 3, 7).  Likewise, C/PA has not shown that the government said that it would work with C/PA in response to the Commander's disclosure of the fact that Shippers may have underbid the 036 Contract because the Commander did not make that disclosure until after the government made those statements (findings 4, 8, 13).  Because C/PA has failed to show an implied misrepresentation—let alone an affirmative misstatement—C/PA has failed to establish a misstatement of existing fact.

Third, even assuming that there was a misrepresentation based upon a promise accompanying a misstatement of existing fact, C/PA has failed to show that we should reform the Prices because it has not shown that the parties real intention was to agree to revise the Prices.  In construing the parties' real intention as part of a reformation, we will not adopt a construction that violates a statute or regulations because contracts that violate a statute or regulation are illegal and void, *ABS Baumaschinenvertrieb*, ASBCA No. 48207, 00-2 BCA ¶ 31,090 at 153,515, and we avoid adopting an interpretation of a contract that would render that contract void. *NVT Tech., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  Here, C/PA agrees wholeheartedly with the statements of government witnesses that the government may not revise a fixed-price contract's prices due to underbidding (app. br. 2-3, 35-37).  Given this fact (finding 9), we cannot conclude that the parties' real intention was to revise the underbid, fixed-price 036 Contract's prices because that would violate a statute or regulation barring the government from revising a fixed-price contract's prices due to underbidding, and thus render the contract void.  Thus, we will not reform the 036 Contract to render it illegal.

C/PA also argues that this case is nearly identical to *Rainbow Valley* (app. br. 47-50; app. reply 9-11).  In *Rainbow Valley*, we reformed a contract where the government promised to exercise its rights under a cancellation clause only when necessitated by a national emergency, and misstated that the cancellation clause was mandatory.  68-2 BCA ¶ 7,195 at 33,413-14. *Rainbow Valley* is very different than this case.  First, the government's statement in *Rainbow Valley* that it would exercise its rights under a cancellation clause only when necessitated by a national emergency was sufficiently specific to constitute a binding promise (*id.*), unlike the government's vague statements that it would work with C/PA here (findings 4, 8).  Moreover, in *Rainbow Valley*, the government misstated an existing fact by affirmatively misstating that the cancellation clause was mandatory, 68-2 BCA ¶ 7,195 at 33,413-14, while the government did not make an affirmative misrepresentation—or even an implied misrepresentation—here.  Finally, in *Rainbow Valley*, the reformed contract sought by

the contractor was legal, (*id.*), while the reform contract sought by C/PA would be illegal here, according to C/PA. Because of those relevant differences, *Rainbow Valley* does not support the conclusion that C/PA is entitled to reformation here.

C/PA finally relies upon our holding in *C/PA I* that it is reasonable to infer from any statement that the government would work with C/PA that the government would renegotiate the Prices (app. br. 43-44; app. reply 17). That reliance is misplaced. *C/PA I* involved a summary judgment motion, so it merely addressed whether, drawing all reasonable inferences in favor of C/PA, there was a genuine issue of material fact (finding 20). And indeed, *C/PA I* expressly held that it did not decide whether the most reasonable inference from the statement that the government would work with C/PA was that the government would renegotiate the Prices (finding 20). As discussed above, the evidence establishes that the most reasonable inference was not that the government would renegotiate the Prices by revising them because CO Fugate expressly told C/PA that he made no guarantee that the government would revise the Prices (finding 4). Moreover, any statements that the government would renegotiate the Prices by discussing revising them were too vague, indefinite, uncertain, and lacking clarity as to all essential terms to constitute binding promises; and would not support the price revision reformation that C/PA seeks. Therefore, *C/PA I* does not compel us to conclude that C/PA is entitled to reformation.

<u>CONCLUSION</u>

For the foregoing reasons, the appeal is denied.

Dated: February 10, 2022

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

10

I concur

John J. Thrasher

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61349, Appeal of Cooper/Ports America, LLC, rendered in conformance with the Board's Charter.

Dated: February 10, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

11